IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>TOMS KING (OHIO) LLC<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 23-50001 (AMK)<br>(Joint Administration Requested)<br><br>Judge Alan M. Koschik |

**DECLARATION OF DANIEL F. DOOLEY IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Daniel F. Dooley, being duly sworn, declares and states, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Restructuring Officer ("CRO") of TOMS King (Ohio) LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"). In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records. I have decades of senior leadership experience in the food, restaurant, automotive, aerospace, capital equipment, healthcare, transportation, metals, oil & gas and real estate industries. In addition to serving as CRO of the Debtors, I am a Principal and CEO of MorrisAnderson where I manage the distressed business consulting practice.

2. I submit this declaration (the "Declaration") in connection with the Debtors' voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") filed in the United States Bankruptcy Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. taxpayer identification number, are: TOMS King (Ohio) LLC (9126); TOMS King LLC (4221); TOMS King (Illinois) LLC (9171); TOMS King (Penn.) LLC (7148); TOMS King (Virginia) LLC (8226); TOMS King (Ohio II) LLC (4081) and TOMS King III LLC (No EIN Number). The Debtors' corporate headquarters is located at 220 N. Smith Street, Suite 305, Palatine, IL 60067.

for the Northern District of Ohio, Eastern Division (the "Bankruptcy Court") on the date hereof (the "Petition Date").

3. I am familiar with the business and financial condition of the Debtors. Except as otherwise indicated herein, the facts set forth in this Declaration are based on my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management, employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the industry in which they operate. Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis. I am authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. I make this Declaration to provide the Bankruptcy Court and all creditors and parties in interest with an overview of the Debtors, their business and the events precipitating the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases") and in support of the "first day" relief requested in the Debtors' First Day Motions (defined below).

## THE DEBTORS' BUSINESS

**A.     Nature of the Debtors' Business**

5. The Debtors constitute one of the largest current franchisees of Burger King restaurants. The Debtors operate 90 Burger King restaurants (the "Restaurants"). The Restaurants span four states: Illinois, Ohio, Pennsylvania and Virginia.

6. The Debtors receive certain corporate management and administrative services from TK Services pursuant to that certain Management Services Agreement, dated as of June 4, 2012, between TOMS King LLC ("TOMS King") and TOMS King Services LLC ("TK Services") (as amended, the "Management Services Agreement"). Such services include purchasing select foodstuffs and restaurant supplies, maintaining payrolls, preparing sales reports required by Burger

King Corporation, and providing legal and information and technology services. On January 1, 2023, the Management Services Agreement was amended to add additional services that would ease the Debtors' transition into chapter 11. All employees of TK Services whose payroll is paid by TOMS King pursuant to the Management Services Agreement work full time on management and administrative services provided to the Debtors.

**B.     Corporate Formation and Structure**

7.     The Debtors are limited liability companies formed under the laws of the State of Delaware. At all times since their formation, the Debtors have maintained their primary offices and conducted their corporate business from 220 N. Smith Street, Suite 305, Palatine, Illinois 60067.

8.     TOMS King is the sole member and 100% owner of each of TOMS King (Ohio) LLC, TOMS King (Illinois) LLC, TOMS King (Penn.) LLC, and TOMS King (Virginia) LLC (collectively, the "Subsidiary Debtors"). TOMS King, TOMS King (Ohio II) LLC and TOMS King III LLC is owned 95% by TOMS King Holdings LLC, a Delaware limited liability company, and 5% by William Matthew Carpenter. An organizational chart is attached hereto as Exhibit A.

9.     Copies of the written consents authorizing the filing of these Chapter 11 Cases by each of the Debtors is attached to their respective Petitions and incorporated by reference herein.

**C.     The Debtors' Franchise Agreements and Leases**

10.    Each of the Restaurants is subject to its own Burger King Restaurant Franchise Agreement, by and between Burger King Corporation ("BKC") and the applicable operating Subsidiary Debtor (collectively, the "Franchise Agreements"). Pursuant to the Franchise Agreements, the Debtors are granted the right to operate the Restaurants using the Burger King trademarks and service marks, and are provided certain operational support from BKC, in

3

exchange for payment of certain royalties and advertising contributions to BKC in accordance with and subject to the terms and conditions of the Franchise Agreements.

11. Each of the Restaurants is also subject to its own lease agreement (the "<u>Lease Agreements</u>") by and between the applicable Subsidiary Debtor and the lessor of the property on which the Restaurant is located. TOMS King provided guarantees of the Subsidiary Debtors' obligations under certain, but not all, of the Lease Agreements.

**D.    The Debtors' Prepetition Secured Indebtedness Under Bank of America Credit Agreement**

12. Prior to the Petition Date, the Debtors (other than TOMS King (Ohio II) LLC and TOMS King III LLC) entered into that certain Credit Agreement, dated as of March 7, 2014, by and among the Debtors (other than TOMS King (Ohio II) LLC and TOMS King III LLC), as borrowers, Bank of America, N.A. ("<u>Boa</u>" or the "<u>Prepetition Lender</u>"), as administrative agent and lender, which was amended and restated from time to time, including most recently pursuant to that certain Fifth Amended and Restated Credit Agreement, dated as of January 28, 2020, as well as by a forbearance agreement and deferral agreement (collectively, as further amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>").

13. Pursuant to the terms of the Prepetition Credit Agreement, as amended, the Debtors (other than TOMS King (Ohio II) LLC and TOMS King III LLC) incurred (a) a term loan facility in an aggregate amount of $44,000,000; (b) a revolving credit facility in a principal amount of up to $2,500,000, and (c) a development loan facility reestablished in a principal amount of $5,000,000. The obligations under the Prepetition Credit Agreement have an outside maturity date of January 28, 2025. The Debtors also have a purchasing card with Prepetition Lender which has a $200,000 purchasing limit as of the Petition Date (the "<u>P-Card Agreement</u>"). As of the Petition

Date, the aggregate outstanding balance due under the Pre-Petition Credit Agreement was approximately $35,494,018.51 and the P-Card Agreement was approximately $57,692, plus interest, costs and fees. The obligations under the Prepetition Credit Agreement are secured by first priority liens on and security interests in substantially all assets of the Debtors (other than TOMS King (Ohio II) LLC and TOMS King III LLC).

**E.      Other Prepetition Liabilities**

14.     I understand the Debtors have estimated unsecured debt in the aggregate amount of approximately $14 million as of the Petition Date. There are amounts due to BKC pursuant to the Franchise Agreements for royalties, advertising contributions and other amounts to BKC. There are also amounts due to landlord under the Lease Agreements. Certain more limited prepetition amounts are also owed to vendors.

**EVENTS LEADING UP TO THE FILING OF THESE CHAPTER 11 CASES**

15.     Over the past several years, and particularly as a result of the COVID-19 pandemic, the Debtors' business suffered significantly from loss of foot traffic, resulting in declining revenue without proportionate decreases in rental obligations, debt service, and other liabilities. Recent increases in costs of shipping and food, decreased availability of labor, and inflation generally have exacerbated the Debtors' cash flow issues. As a result, although certain of the Restaurants have remained profitable, others have been operating at a loss, resulting in the Debtors' inability to meet their obligations and achieve the financial metrics required under their Prepetition Credit Agreement.

**A.      Forbearance Agreements**

16.     Consequently, in or around March 2022, the Debtors and their Prepetition Lender entered into negotiations for the deferral of certain principal payments due under the Prepetition Credit Agreement. On March 31, 2022, the Debtors and the Prepetition Lender entered into a

5

23-50001-amk    Doc 21    FILED 01/02/23    ENTERED 01/02/23 16:58:21    Page 5 of 20

Deferral Agreement, later amended pursuant to that certain Deferral and Consent Agreement, dated as of May 5, 2022 and effective May 1, 2020 (collectively, the "Deferral Agreement"), deferring the Debtors' upcoming principal payments, upon the terms and conditions set forth in the Deferral Agreement, through April 30, 2022, which was subsequently extended through the Maturity Date.

17. Subsequently, on May 13, 2022, the Prepetition Lender notified the Debtors that they were in default under the Prepetition Credit Agreement for, among other things, failure to meet certain financial covenants as set forth therein. Further negotiations ensured and, on September 1, 2022, the Debtors and the Prepetition Lender entered into a Forbearance and Modification Agreement, which was modified pursuant to that certain First Amendment to Forbearance and Modification Agreement, dated as of October 21, 2022 (collectively, the "Forbearance Agreement"). Pursuant to and subject to the terms and conditions of the Forbearance Agreement, the Prepetition Lender agreed to forbear from exercising its remedies against the Debtors in respect of the defaults listed on Schedule 1 thereto.

B. **Pre-Petition Marketing and Restructuring Efforts**

18. Entry into the Deferral and Forbearance Agreements allowed the Debtors time to negotiate with their Prepetition Lender, BKC and other key constituents, together with their respective advisors and professionals, in an effort to develop a plan to streamline the Debtors' operations and restructure their liabilities through a chapter 11 bankruptcy process.

19. Specifically, during July 2022, M3 Partners were retained to perform a financial analysis of the performance of the Debtors, their stores, and operations in an effort to determine a path forward for the company. The wholesale operational analysis was reported by M3 to the Debtors and their key constituents during September 2022. The Debtors' key stakeholders reviewed and discussed the analysis and agreed that, for the reasons set forth herein, a chapter 11

process would be the best approach to maximize the value of the Debtors' assets. To that end, in early November 2022, the Debtors appointed RJ Dourney as independent manager of TOMS King LLC, TOMS King (Ohio II) LLC, and TOMS King III LLC and myself as Chief Restructuring Officer for each of the Debtors.

20. The Debtors also engaged ReInvest Capital ("ReInvest") to conduct marketing of the Debtors' assets and to run a competitive bidding process. Having worked with ReInvest to market the assets for the period prior to the Petition Date, the Debtors are now in a position to complete a sale or reorganization process in an expedited manner through these Chapter 11 Cases. ReInvest has contacted over 200 potential purchaser prospects and will continue such marketing efforts during the bidding process. As set forth in more detail below, the Debtors are also able to fund such a process through the use of Cash Collateral with permission from its Prepetition Lender. The Prepetition Lender required certain case milestones be achieved during the sale and/or restructuring process, however, the Debtors believe the milestones are reasonable and leave sufficient time to conduct a fulsome and robust marketing and sale process.

21. During this time, I have worked with management, the MorrisAnderson team, and the Debtors' other advisors, to prepare for the filing of these Chapter 11 Cases. I am therefore familiar with the voluntary chapter 11 petitions, the motions being filed with the petitions and other pleadings filed at substantially the same time as this Declaration.

## FIRST DAY MOTIONS

22. To enable the Debtors to operate effectively and minimize potential adverse effects during the Chapter 11 Cases, the Debtors are requesting certain "first day" relief in various motions and applications filed with the Court concurrently herewith (collectively, the "First Day Motions"). This relief is critical to the Debtors' efforts to preserve and maximize value for the benefit of

7

23-50001-amk    Doc 21    FILED 01/02/23    ENTERED 01/02/23 16:58:21    Page 7 of 20

creditors and is intended to minimize the potential adverse effects that commencement of the Chapter 11 Cases may have on the Debtors and their business operations.

23. I believe that the relief requested in each First Day Motion is: (a) necessary to preserve and maximize the value of the Debtors' estates; (b) essential to the successful reorganization of the Debtors; and (c) serves the best interests of the Debtors, their estates, their creditors and other parties in interest.

A. **Joint Administration Motion**

24. Contemporaneously herewith, the Debtors are filing a motion (the "Joint Administration Motion") seeking entry of an order, pursuant to Bankruptcy Rule 1015(b), authorizing and directing, for procedural purposes only, the joint administration of these Chapter 11 Cases.

25. In the Joint Administration Motion, the Debtors will request that the Bankruptcy Court maintain one file and one docket for all of the jointly administered Chapter 11 Cases under the case number assigned to TOMS King (Ohio) LLC and that these Chapter 11 Cases be jointly administered under a consolidated caption.

26. The Debtors believe that joint administration of the Debtors' Chapter 11 Cases is warranted because the financial affairs and business operations of the Debtors are closely related. Entry of an order directing joint administration of these cases will avoid duplicative notices, applications and orders, and will thereby save considerable time and expense for the Debtors and result in substantial savings to their estates. Moreover, I do not believe joint administration will adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.

8

23-50001-amk    Doc 21    FILED 01/02/23    ENTERED 01/02/23 16:58:21    Page 8 of 20

27. For these reasons, I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

B. **Creditor Matrix Motion**

28. Pursuant to the motion seeking entry of an order authorizing the Debtors to (a) compile a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (b) file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor; (c) redact certain personal identification information; and (d) limit notice required under Bankruptcy Rule 2002 (the "Creditor Matrix Motion").

29. Like the Joint Administration Motion, in my view, the purpose of the Creditor Matrix Motion is to avoid the expensive, time consuming, and administratively burdensome tasks of preparing separate lists of creditors for each debtor. Similarly, permitting the Debtors to prepare and file a consolidated list of their thirty largest unsecured creditors is justified on identical grounds—to avoid needless administrative burdens and costs. I further believe it is appropriate for the Debtors to redact personal identification information of the Debtors' current and former employees to avoid, among other things, the risk of identity theft.

30. I therefore believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

C. **Motion to Extend Deadline to File Schedules and Statements**

31. Pursuant to the motion seeking an extension to the deadline to file schedules and statements of financial affairs (the "Motion to Extend Schedules Deadline"), the Debtors seek an extension of slightly more than two weeks to file their schedules and statements of financial affairs (the "Schedules and Statements"). Bankruptcy Code section 521 and Bankruptcy Rule 1007(c)

9

require a debtor to file, among other things, its schedules of assets and liabilities, schedules of current income and current expenditures, and a statement of financial affairs within fourteen (14) days of the petition date. Pursuant to Bankruptcy Rules 1007(a)(5) and (c), this Court is authorized to grant the Debtors additional time to file their Schedules and Statements beyond the fourteen (14) day extension provided under Bankruptcy Rule 1007-1(c) for cause.

32. The Debtors have been unable to complete its Schedules and Statements at this early stage in this case because of: (a) the level of sophistication of their capital structures and their financial affairs; (b) the limited staffing available to perform the required internal review of the Debtors' books and records and accounts and affairs; (c) the diversion of resources necessary to attend to numerous issues in connection with the commencement of the cases; and (d) the accelerated pace at which the Debtors' time-sensitive bankruptcy efforts have proceeded, including drafting first-day pleadings.

33. I therefore believe that the relief requested in the Motion to Extend Schedules Deadline is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and that such relief will enable the Debtors to ensure the Schedules and Statements are completed accurately and with the required amount of attention and diligence that can be given if additional time is granted.

**D.     Omni Retention Application**

34. Pursuant to the application to retain Omni Agent Solutions (the "Omni Retention Application"), the Debtors seek to retain Omni Agent Solutions ("Omni") as the Debtors' claims and noticing agent to, among other tasks, (i) serve as the noticing agent to mail notices to the estates' creditors and parties in interest; (ii) provide computerized claims database services; and (iii) provide expertise, consultation, and assistance in connection with other administrative services as they arise in the Chapter 11 Cases pursuant to the provisions of Omni's engagement agreement.

35.     Based on my discussions with the Debtors' advisors, I believe that retention of Omni is appropriate under the circumstances and in the best interest of the estates. Based on all engagement proposals the Debtors' obtained, I believe that Omni's rates are competitive and comparable to the rates charged by its competitors for similar services.

36.     The need to retain Omni is supported by the necessity of serving notice on a very large group of potential creditors that number in the thousands. While I understand the overwhelming majority of the persons and entities on the notice list do not hold claims against the Debtors, the Debtors have nevertheless decided to provide actual notice to a very broad group of current and former employees who were in the Debtors' payroll system over the past two years and vendors in the accounts payable system whether or not the Debtors reflect claims. Given this potential scope, and the likely need for robust claim processing requirements, it is my opinion that the appointment of a claims and noticing agent will provide the most effective and efficient means relieving the Debtors and/or the Bankruptcy clerk's office of the significant administrative burden that would otherwise be required to address. I therefore believe that the Omni Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business pending the chapter 11 process without significant disruption.

### E.     Employee Wage and Benefit Motion

37.     Contemporaneously herewith, the Debtors will seek an order of the Bankruptcy Court, pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Rule 6003 of the Federal Rules of Bankruptcy Procedure, (i) authorizing, but not requiring, payment of prepetition wages, employee benefits and expense reimbursement, (ii) authorizing and directing banks to honor checks with respect thereto, and (iii) authorizing, but not requiring, payment of post-petition wages, employee benefits and expense reimbursement (the "Employee Wage Motion").

38. The Employee Wage Motion seeks authority to pay the Debtors' 2,177 employees, including 396 full-time employees and 1,781 part-time employees, the wages, compensation and benefits earned during the prepetition period (as set forth more specifically in the Employee Wage Motion), as well as to continue making such payments in the ordinary course of its business. Approximately 2,087 Employees are compensated on an hourly basis and there are approximately 90 Employees who receive a salary. The majority of the Employees consist of the Debtors' part-time crew members. The Employees also include restaurant general managers, restaurant managers, restaurant managers in training and shift leaders.

39. The Employee Wage Motion also seeks the authority to continue to honor payroll obligations pursuant to the Management Services Agreement for employees of TK Services that provide management and administrative services to the Debtors. TK Services employs approximately 43 full time employees dedicated to providing the services to the Debtors, including 19 corporate employees and 24 restaurant district area managers.

40. The continued service of the Debtors' and TK Services employees, and therefore the continuation of payment of wages and benefits and reimbursement of expenses as set forth in the Wage Motion, is essential to the continuation of the Debtors' business operations during these Chapter 11 Cases. More than that, I recognize that the Debtors' skilled workforce generally relies exclusively on the compensation and benefits provided by or funded by the Debtors to pay their daily living expenses, and will obviously be exposed to significant financial hardships if the Debtors are not permitted to continue providing and funding such compensation and benefits in the ordinary course of business.

41. None of the amounts to be paid to any single employee for the period noted above will exceed the $15,150.00 priority cap in section 507(a)(4) of the Bankruptcy Code.

42. Based on my knowledge of the Debtors' business and operations, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and is necessary to enable the Debtors to continue to operate in the ordinary course without disruption.

F. **Insurance Motion**

43. Pursuant to the motion seeking authority to continue to maintain and pay prepetition amounts for certain insurance policies (the "Insurance Motion"), the Debtors seek entry of an order authorizing (i) authorizing, but not directing, the Debtors to (a) pay their obligations under insurance policies entered into prepetition, (b) renew, supplement, modify, or purchase insurance coverage in the ordinary course; and (ii) granting related relief.

44. I understand that the Debtors maintain approximately eight (8) insurance policies for, among other things, general liability, auto vehicle, the Debtors' directors and officers liability, crime, casualty, and workers' compensation. In the twelve months preceding the Petition Date, the Debtors paid approximately $133,543 on average each month in the aggregate on account of premiums under the existing insurance policies, including premiums paid related to workers' compensation policies. The Debtors generally pay premiums with respect to the Insurance Policies, as a combination of monthly or annual payments, to the Debtors' insurance broker.

45. In my view, the insurance policies are essential to the preservation of the value of the Debtors' business, properties, and assets. I understand that, in many cases, the insurance coverage provided by the insurance policies is required by diverse regulations, laws, and contracts. Any lapse in coverage may require the Debtors discontinue all or part of their business operations. This would have a significant negative impact on the Debtors' operations and would place the otherwise likely success of these Chapter 11 Cases at risk. Accordingly, I believe that given the size, complexity, and evolving nature of the Debtors' business, the Debtors need the flexibility to

maintain, renew, supplement, modify, or purchase insurance coverage in the ordinary course of business.

46. In my business judgment, the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and represents another necessary component to the aggregate relief sought in these Chapter 11 Cases that (if granted) would allow the Debtors' business to function without significant disruption.

**G.    Taxes Motion**

47. Pursuant to the motion seeking authority to pay prepetition taxes (the "Taxes Motion"), the Debtors seek authority to remit and pay taxes and fees (up to $`1,000,000 on a final basis) without regard to whether such obligations accrued or arose before or after the Petition Date, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date.

48. The Debtors collect, withhold, and incur and pay sales taxes, use taxes, annual report, permit and licensing fees, real estate and personal property taxes, franchise taxes and fees, unclaimed property and various other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtors then remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Government Authorities").  The failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including:  (a) the Government Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the administering the estate; (b) the Government Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that would harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their essential duties related to the Debtors'

14

operation.  Finally, not paying the taxes and fees could result in penalties, the accrual of interest, or both.

49.    For these reasons, I believe that the relief requested in the Taxes Motion is not only normal and customary in chapter 11 cases, but it is also in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**H.    Utilities Motion**

50.    Pursuant to the motion seeking authority to pay prepetition utility obligations in the ordinary course (the "Utilities Motion"), the Debtors seek entry of an order (i) prohibiting utility providers from altering, refusing, or discontinuing services; (ii) determining adequate assurance of payment for future utility services; (iii) establishing procedures for determining adequate assurance of payment for future utility services; and (iv) granting related relief, including authorizing certain payments to the third-party administrator that manages the Debtors' utility accounts.

51.    The requested relief, in my view, represents another critical piece to permitting the continued operation of the Debtors' business during the pendency of these Chapter 11 Cases without interruption.  The Debtors' restaurants simply cannot function without water, sewer service, electricity, waste disposal, natural gas, and other similar services (collectively, the "Utility Services") obtained from numerous utility providers or brokers (the "Utility Providers").

52.    I understand that the Debtors expect to pay approximately $360,000 per month in the post-petition period based on the average costs over prior twelve-month period and accounting for utility payments for stores that are permanently closed as of the Petition Date.

53.    The Debtors propose to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business.  Based on my work on the Debtors' budget and understanding of the cash generated in the ordinary course of the Debtors' business, the Debtors'

will have ample liquidity to pay the Utility Services obligations in accordance with their prepetition practice and therefore the utilities should need no additional security. But the Debtors are nevertheless proposing to provide them with additional security in the form of a deposit into a segregated account of $200,000.00 (the "Adequate Assurance Deposit"), which represents an aggregate amount equal to more than one-half of the Debtors' anticipated monthly cost of Utility Services.

54. In my experience and in discussing the issue with the Debtors' advisors, it is my opinion that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with their prepetition practices, constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

**I.     Cash Management Motion**

55. Pursuant to the motion seeking to maintain the Debtors' current bank accounts and systems (the "Cash Management Motion") the Debtors seek to (a) continue operating the Cash Management System (as defined therein); (b) continue use of purchasing card pursuant to the P-Card Agreement; (c) honor their prepetition obligations related thereto; (d) utilize existing business forms; and (e) continue performing under and honoring their respective obligations and transactions related to Intercompany Transactions (as defined therein) and Non-Debtor Affiliate Transactions (as defined therein) in the ordinary course of business, consistent with historical practice.

56. I believe that the Debtors' business will operate more efficiently using an integrated, centralized Cash Management System to manage the cash of operating units in a cost-effective manner as the Debtors have been doing historically. This includes using the system in the ordinary course to collect, transfer, and disburse funds. Because the Debtors have historically operated with such a system, any disruption to the system would have a sharply adverse effect on

operations and thus highly detrimental to the Debtors' estates and their creditors. Therefore, in my business judgment, the Cash Management System should be preserved on a post-petition basis.

### J.    Cash Collateral Motion

57.    By the motion seeking consensual use of cash collateral (the "Cash Collateral Motion"), the Debtors request entry of interim and final orders (collectively, the "Cash Collateral Orders") (a) authorizing the Debtors to use "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code; (b) granting adequate protection to prepetition loan parties; (c) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Cash Collateral Orders; and (d) granting related relief.

58.    Based on my work in developing the Debtors' budget, they will need access to Cash Collateral to ensure that they are able to continue operating their businesses during these Chapter 11 Cases, and pursue a value-maximizing restructuring process. Without prompt access to Cash Collateral, the Debtors will be unable to satisfy payroll obligations, satisfy trade payables incurred in the ordinary course of business, or fund the administration of these Chapter 11 Cases. This would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

59.    Together with the assistance of management and the MorrisAnderson team, I have assisted with the preparation of a cash flow forecast and budget for the use of Cash Collateral during the interim period, which is attached to the Debtors' proposed interim cash collateral order (the "Budget"). Based on my knowledge of the Debtors' business and value maximizing goals in these Chapter 11 Cases, I believe that the Budget establishes that the Debtors will have adequate liquidity during the interim period. The Budget contains line items for cash anticipated to be received and disbursed during the time period covered by the Budget. I believe that the Budget

17

23-50001-amk    Doc 21    FILED 01/02/23    ENTERED 01/02/23 16:58:21    Page 17 of 20

includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' business as a bridge while the Debtors restructure.

60. In order to obtain consent for use of cash collateral from the Debtors' Prepetition Lender, they required an adequate protection package in the form of adequate protection liens and adequate protection superpriority claims. The Prepetition Lender further required certain case milestones to ensure that these Chapter 11 Cases move expeditiously through the restructuring process. I believe that each form of adequate protection and the case milestones are appropriate under the circumstances. Continued access to Cash Collateral on the terms set forth in the orders will allow the Debtors to responsibly fund these Chapter 11 Cases, continue their business operations, and realize the benefits of a restructuring process with the oversight of the Bankruptcy Court for the benefit of the Debtors' creditors.

### K. First Day Hearing Motion

61. By the motion seeking expedited consideration (the "First Day Hearing Motion"), the Debtors request entry of an order scheduling a hearing for expedited consideration of the First Day Motions outlined herein. Specifically, the Debtors respectfully request a hearing on January 4 , 2023. As set forth in the First Day Hearing Motion, the Debtors believe that service as described in the Motion is sufficient under the circumstances to notify affected parties of the relief requested therein.

## CONCLUSION

62. I believe that the protection of the Bankruptcy Court will enable the Debtors to maximize the value of their assets for the benefit of the Debtors' estates and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: January 1, 2023

_____
Daniel F. Dooley

# Exhibit A



Key:

Nondebtor

Debtor

WBD (US) 60127942v2